IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRENDA JONES,

                        Plaintiff,                        OPINION AND ORDER

    v.                                                              19-cv-699-wmc

BRENT YORK, ADAMS COUNTY, &
AS-OF-YET UNKNOWN EMPLOYEES
OF ADAMS COUNTY SHERIFF'S
DEPARTMENT,

                       Defendants.

---

In 2016, plaintiff Brenda Jones was wrongfully convicted of arson in Adams County Circuit Court, Wisconsin. After the vacating of that conviction and all other charges being dropped without objection by the District Attorney, Jones brought this civil action alleging violations of the U.S. Constitution and state law by an Adams County criminal investigator and others employed by the Adams County Sheriff's Office. Presently before the court is defendants' motion for summary judgment. (Dkt. #33.) While the court finds the conduct of criminal investigator York, Adams County prosecutors, and Jones' original defense counsel deeply troubling, the court will grant that motion because it does not rise to a violation of the U.S. Constitution for the reasons discussed below.[1] Whether there is a remedy for wrongful prosecution and conviction under state law remains to be

---

[1] Also before the court is plaintiff's unopposed motion to amend/correct her brief in opposition (dkt. #47), which the court will GRANT.

determined in a future state administrative or judicial proceeding.[2]

UNDISPUTED FACTS[3]

**A.  The Fire and Subsequent Investigation**

In the early morning of February 17, 2013, Adams County dispatch received a call from one of Jones' neighbors stating that he heard an explosion and saw that the house behind his was on fire and already mostly destroyed.  By the time the fire department and investigators arrived, the house was fully burned to the ground.  Brent York, an investigator for the Adams County Sheriff's Department, was assigned to investigate the fire.

York then called Jones, who had been at her sister's home that night.  At that time, Jones explained that there had been problems with ice dams leaking water in the walls, sockets popping, and other electrical problems.  By the time Jones arrived at the scene of the explosion about an hour after that initial call, York had completed his initial investigation, and believed that the fire was most likely caused by an accidental electrical malfunction, released the scene the same day, and closed the file on February 27, 2013. At that time, Jones' homeowner's insurance company, Rural Mutual Insurance Company, also reached the same, initial determination -- the fire was accidental.

---

[2] In addition to the state common law claims asserted by plaintiff in this case, over which this court will decline supplemental jurisdiction, the state of Wisconsin has authorized an administrative claims board to "equitably compensate" an individual wrongfully convicted through no fault of her own, albeit at rates that would appear to understate substantially its actual impacts.  *See* Wis. Stat. § 775.05; *Compensation for the Unjustly Imprisoned: A Model for Reform in Wisconsin*, 2005 Wis. L. Rev. 1181.

[3] Unless otherwise indicated, these facts are deemed undisputed for the purposes of summary judgment based on the parties' proposed findings of fact, responses, and supporting material.

Rural Mutual arranged for Jones to stay at a motel after the fire.  On March 3, 2013, Jones' friend, Alan Onopa, came to the motel to stay with her.  According to Jones, Onopa then got drunk, threatened her, and "turned into a nightmare."  (Jones Decl. (dkt. #30) ¶ 7.)  Again, according to Jones, Onopa further told her that if she did not take care of him and give him money, he was going to turn her in for burning down the house and would collect a reward.  He also grabbed her by the throat and told her he had been taping her for some time.  Finally, after Onopa fell asleep, Jones left the motel to stay with her sister.

The following day, Jones called the Marshfield Police Department and spoke with Officer Caleb Bornbach, who memorialized their conversation in a contemporaneous police report.  Jones informed Officer Bornbach of Onopa's threats, including that he would say she started the fire if she did not give him money from the fire settlement.  Jones also called Richard Pohlod, the Rural Mutual insurance adjuster, to report Onopa's threats.  Finally, Jones tried to call Adams County Investigator York, but no one answered.

Between March 4 and March 7, Onopa called Jones numerous times, leaving threatening voicemails on her phone.  At some point, Onopa also apparently called Rural Mutual, because on March 7, 2013, Pohlod informed York that Onopa had contacted him and said that Jones had burned down her house.  Pohlod told York that Onopa claimed to have an audio recording of Jones admitting to setting the fire on purpose.  Based on that call, York reopened his investigation of the case, although at this time, York still had no physical evidence that Jones had intentionally burned her house down.

On March 21, 2013, York met with Jones and recorded their conversation.  During the interview, Jones told York that: (1) Onopa threatened her and told her that if she did

not "take care of him" and give him money, he would turn her in for burning the house down; (2) Onopa "had me by the throat"; (3) the next day, Jones reported Onopa's behavior to the Marshfield Police Department and Pohlod; and (4) Onopa took some of Jones' belongings from the motel room.  In his police report of this interview, however, York made no mention of Jones telling him that Onopa put his hands on her throat, although he did note that Jones had made a theft report against Onopa to the Marshfield Police Department.

During her interview with York, Jones also played for him some of the voicemails from Onopa, on which Onopa could be heard saying that if Jones did not call him back, he would send his recording to the insurance company.  York then asked Jones about the recording referenced by Onopa.  Jones denied its existence, and she told York that Onopa was lying and attempting to extort money from her.  York further asked Jones to call Onopa in his presence, so that he could listen in and record their conversation.  Jones agreed to do so, and they arranged to meet at Jones' sister's house later that day to conduct the call.

About an hour after the interview, York met Jones at her sister's house as agreed so that Jones could call Onopa in York's presence.  While the parties agree that this call was recorded, York now represents that he was unable to later locate the record.  Regardless, the parties agree that during the call, Onopa told Jones that her insurance company was going to pay him $3,500 for the recording he allegedly had of Jones, but he would give Jones the recording instead if she paid him.

On March 28, 2013, Jones again called Marshfield Police Officer Bornbach to add that when Onopa threatened her with extortion, he also grabbed her by the neck, but did

4

not choke her.  Jones also mentioned that York had been investigating the fire, and Bornbach told Jones that he would consult with York.  Later that same day, Bornbach called York, memorializing their call in a report.  During the call, York admitted to Bornbach that Jones told him that Onopa had put his hands around her throat and threatened extortion.[4]  Ultimately, however, York did not pursue any investigation into Jones' allegations against Onopa.

On April 2, 2013, York spoke with Onopa directly.  Onopa told York that he had made a recording of Jones talking about burning her house down two or three days after the fire, while they were both staying at a Motel 6 in Arlington Heights, Illinois.  During that conversation, Onopa also asserted to York that his son, Daniel Onopa, had installed a smoke detector in Jones' house.  Later, York followed up with the son and asked him if he recalled installing a smoke detector, and he said he did not.

On April 8, 2013, York received a recording from Onopa and, after listening to it, wrote in a police report that he recognized the voices as being those of Onopa and Jones' although he acknowledged "there was background noises that made it difficult at times to clearly hear the voices."  (Mills Decl., Ex. C (dkt. #36-3) 13.)  According to York's report, in that recording, Alan Onopa

> asked if Brenda had put something in the heater, and Brenda's answer was mostly unclear but I heard the word "match" in her answer.  Brenda was then laughing and said, "I tried to stick it

---

[4] Bornbach also noted in his report that he would not request Onopa be charged.  In a later declaration, Bornbach explains that he "did not recommend charges in Marshfield for Alan Onopa for extortion or disorderly conduct because my report indicates that York said that while he was in Wausau interviewing Brenda, he obtained this recording where Onopa tried to extort Brenda Jones for $3500.  I did not and do not know where Alan was during this incident, so the evidence gathered would have been outside my jurisdiction."  (Bornbach Decl. (dkt. #46) ¶ 7.)

> in the heater and it," the rest of her answer is unclear.  Alan
> then said that he could not believe that she did all of that
> damage with just a match, and Brenda answered "ya."

(*Id*.)  Unsurprisingly, plaintiff objects to York's characterization of the recording, further contending that the recording is inaudible as to the alleged, female voice.

On May 13, 2013, York met with Onopa again, this time at the Wood County Jail where Onopa was then being held on a probation violation.  During this interview, which was recorded, Onopa told York that:  Jones did not have any money; he believed Jones had burned her house down to be with him; he had never planned to give Jones the audio recording for money; instead, he wanted money for items belonging to him that had been stored in Jones' garage and destroyed by the fire; Jones described using an electric heater and putting a blanket in the heater to start the house on fire; and before the fire, Jones had taken a lot of stuff out of her house, storing the items at her sister's house.  There is no evidence that an electric heater was in the home.[5]

In June of 2013, York received Jones' cell phone records for the period of January 15 through February 28, 2013, from U.S. Cellular.  Mark Digerness worked for U.S. Cellular, and he had conversations with York about those phone records and what the underlying data meant.  In particular, Digerness explained to York how to understand where a cell phone might be located based on the data.  All of the phone calls in the records

---

[5] Also on May 13, 2013, Onopa made a written statement to his probation agent while in custody at the Wood County Jail.  In that statement, Onopa wrote that he recorded Jones' alleged confession on March 15, 2013 -- a week *after* he told Rural Mutual Insurance adjuster, Pohlod, that he had a recording of Jones confessing to arson.  The parties dispute whether York ever became aware of this written statement, although plaintiff does not argue that this evidence was suppressed or otherwise cite it to support her constitutional claims.

indicate that Jones was in Wisconsin, not Illinois, in the days and weeks after the fire.

On August 4, 2014, York referred the case to the Adams County District Attorney for a decision on charging Jones with arson.  In the materials submitted to the DA, York did not recount Jones' claim that Onopa had put his hands on her throat, nor did he ever subsequently inform that claim.  Additionally, the case file did not include the audio recording of the March 21, 2013, call between Jones and Onopa, during which he threatened to turn over a recording to Rural Mutual for $3,500 unless she paid him.  After being informed that the recording was missing, York searched his computer and audio recorders, but was unable to find it.[6]

## B. The Criminal Pre-Trial Proceedings, Trial, Vacation, and Dismissal of Charges

On February 24, 2015, a criminal complaint was filed against Jones in Adams County Circuit Court, charging her with arson of a building with the intent to defraud under Wis. Stat. § 943.02(1)(b).  On January 12, 2016, Jones filed a motion to dismiss the case, arguing that York's failure to preserve the March 21, 2013, recording entitled her to dismissal, because the recording was potentially or apparently exculpatory evidence.  A hearing on that motion was held on February 4, 2016, and after considering the evidence and arguments, including sworn testimony by Investigator York and Jones, the court held that the lost recording was neither potentially nor apparently exculpatory and denied the motion.

---

[6] York testified that he did not destroy the recording.  Plaintiff purports to dispute this, but cites to no evidence to support this proposition.

Jones' case proceeded to a jury trial on May 5 and 6, 2016.  During the trial, the recording that was purported to be Jones confessing to arson to Onopa at a motel in Arlington Heights, Illinois, was played for the jury.  Jones' cell phone records were also produced and discussed.[7]  Also at trial, York testified that he did not recall hearing about any physical altercation between Onopa and Jones, and he also believed that Jones' report to Officer Bornbach was just a theft report.  On May 6, 2016, the jury returned a verdict of "guilty," and Jones was later sentenced to a term of seven years of probation with nine months jail as a condition of probation.  She was also ordered to pay restitution in the amount of $82,162.78.

Following the trial, Jones through new counsel filed a motion for post-conviction relief on three grounds.  First, she argued that Jones' trial counsel performed ineffectively by failing to move to suppress the recording in which she supposedly confessed to setting fire to her house, by failing to investigate and obtain Officer Bornbach's police report, and by failing to investigate Onopa's extended supervision records.  Second, Jones argued that the government's failure to disclose Officer Bornbach's report was improper, as was the failure to disclose materials from the Department of Corrections' file on Onopa and the fact that Onopa had nine other criminal convictions.  Finally, Jones argued that various, newly discovered evidence created a reasonable probability of a different result at retrial.

---

[7] The trial transcript shows that both the prosecution and Jones' trial counsel Jason Lockery questioned York about the phone records.  (Trial Tr. Day 1 (dkt. #36-1) 160:20-161:13, 177:19-181:17; Trial Tr. Day 2 (dkt. #36-2) 100:12-101:15, 127:24-130:17.)  However, Lockery apparently failed to draw out the fact that York's records indicate Jones (or at least her phone) was in Wisconsin in the days and weeks following the fire, which would appear to contradict Onopa's testimony that Jones was with him in Arlington Heights, Illinois at the time he claimed to have recorded his discussion with her about the purported arson.  (*See id.* 208:2-4, 208:24-25.)

A hearing on this post-conviction motion was held on June 6, 2018.  At the hearing, Jones' former trial counsel, Attorney Jason Lockery, admitted that he:  was aware of Ms. Jones' contacts with Officer Bornbach before the trial; had the information necessary to obtain Officer Bornbach's report before trial; and had requested that a public records request be made for Officer Bornbach's report three to four months before trial, but just never followed up on the request.  Also during the hearing, the court observed that it considered the "most significan[t]" issue to be Jones' trial attorney's failure to object to the admission of Onopa's extortionate recording, concluding that "it would have been inadmissible because it was made for an improper purpose for extortion and would therefore be unlawful under section 968.31 of the statutes."  (Mills Decl., Ex. H (dkt. #38-8) 4.)  On October 5, 2018, the government later conceded Jones' post-conviction motion. Three days later, the court granted Jones' motion for a new trial and vacated her conviction. Presumably because the state conceded the motion, the court did not issue a written opinion when issuing its order vacating Jones' conviction.  On November 12, 2018, all charges against Jones were dismissed.

### C. Procedural History

Jones then filed the present suit against York, Adams County, and various unknown employees of the Adams County Sheriff's Department.  In her operative complaint, she alleged violations of her due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, conspiracy to deprive her of her constitutional rights, and supervisor liability, all brought under 42 U.S.C. § 1983.  She also alleged intentional misrepresentation, negligent misrepresentation, negligent infliction of emotional distress,

malicious prosecution, and indemnification under Wisconsin state law.  Defendants have now moved for summary judgment on all of plaintiff's claims.

## OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As an initial matter, plaintiff now agrees to the dismissal of her conspiracy and supervisory liability claims.  (Pl.'s Opp'n (dkt. #48) 5 n.1.)  Additionally, plaintiff never amended her complaint to identify any of the "unknown employees" named as defendants, nor has she proposed any facts as to their liability, and so they, too, will be dismissed.  *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."); *see also Newhouse v. Johnson*, No. 04-C-654, 2006 WL 2583429, at *8 (E.D. Wis. Sept. 6, 2006) (dismissing John Doe defendant at summary judgment after plaintiff failed to identify or effectuate service of process on John Doe even after discovery).  That leaves plaintiff's federal due process and state law claims against defendants York and Adams County, which the court addresses below.

## I.  Constitutional Claims

Plaintiff argues that York violated her right to due process by withholding exculpatory evidence from prosecutors, falsifying evidence, and testifying falsely at Jones' criminal trial.  (Pl.'s Opp'n (dkt. #48) 5-29.)  She also contends that York "maliciously caused a criminal complaint to be issued against her without probable cause."  (*Id.* at 5.)  The court will take up each of these arguments in turn.

### A.  Withheld Evidence

Under *Brady v. Maryland*, 373 U.S. 83 (1963), a prosecutor violates due process by withholding material, exculpatory evidence, including evidence related to a witness's credibility, where the defendant's guilt or innocence hinges on the reliability of that witness's testimony.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  A corollary of this rule is that police officers "must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution."  *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).  To prevail on such a claim against an officer, a plaintiff must show that "(1) the evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice."  *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) (citing *Harris*, 486 F.3d at 1014).  Additionally, the general rule in a civil *Brady* case is that the officer must have acted "intentionally or at least recklessly."  *Id.* at 832 n.2 (citing *Daniels v. Williams*, 474 U.S. 327 (1986)).

Significant to this case, however, withheld evidence may only support a *Brady* claim if the evidence was "not otherwise available to the defendant through the exercise of reasonable diligence."  *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002).  Thus,

11

evidence that is known to the accused is not actionable under *Brady*. *See Cairel*, 821 F.3d at 832. Additionally, a delay in disclosing evidence does not necessarily constitute a *Brady* violation; it is only when the disclosure was made "too late for the defendant to make use of the evidence." *O'Hara*, 301 F.3d at 569.

Here, Jones asserts that York withheld various pieces of material and exculpatory evidence from the prosecutor. First, plaintiff claims that York did not provide the prosecutor with the purported recording of Onopa and Jones confessing to the arson before a charging decision was made. Specifically, according to plaintiff, "York only provided the District Attorney's Office with his police reports and did not provide the prosecutors with a copy of the original recording or the alleged enhanced recording for their review in making a charging decision." (Pl.'s Opp'n (dkt. #48) 12.) Even assuming that plaintiff is correct and York did not provide the actual recording to the prosecutor before the charging decision, however, there is no dispute that the recording was eventually produced. Indeed, it was played for the jury at trial. Plaintiff does not argue that the recording was provided too late for Jones to make use of the evidence, and while blame might be shared by both Jones and the district attorney's office if the prosecutor failed to listen to it before making the charging decision, no reasonable fact finder could find that the recording was unlawfully withheld from Jones or her counsel.

Second, plaintiff criticizes York for failing to obtain and provide to the prosecutor with Marshfield Police Officer Bornbach's report, in which he summarizes Jones' immediate report that Onopa had threatened her and put his hands on her neck. Albeit second hand, that report also documents York's apparent statement to Bornbach

12

confirming that Jones had told York about her physical altercation with Onopa.  Again, however, the problem with this argument is that Bornbach's report was readily available to Jones and her counsel through the exercise of reasonable diligence.  In particular, (1) Jones knew that she had called Bornbach to report Onopa's behavior, and she so testified at trial; (2) a voicemail left for York by Bornbach was played for the jury; *and* (3) York confirmed at trial that Bornbach was the officer to whom Jones reported Onopa's threats.  Moreover, at the June 6, 2018, post-conviction motion hearing, Jones' former trial counsel admitted that he was aware of Jones' contacts with Bornbach and that he had the information necessary to obtain Bornbach's report, but simply failed to do so.  This evidence shows that Jones was or should have been aware of the Bornbach report, and she could have, through the exercise of reasonable diligence, obtained the report herself.  Therefore, while troubling, York's failure to disclose Officer Bornbach's report is not actionable under *Brady*.

Finally, and most troubling, plaintiff challenges York's failure to provide the prosecutor (and as a result, the defense) with the March 21, 2013, recording of the conversation between Jones and Onopa, which York acknowledges he recorded.  However, defendants contend that collateral estoppel precludes this claim, as the issue was fully litigated in the underlying criminal case through a pretrial motion.  The doctrine of collateral estoppel (more commonly referred to as issue preclusion) "bars the relitigation, in subsequent proceedings between the same parties, of specific issues heard and decided in their previous suit."  *Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 158 (7th Cir. 1995).  This doctrine has been held to apply to § 1983 plaintiffs who attempt to relitigate in federal court issues decided against them in state criminal proceedings.  *Allen v. McCurry*,

449 U.S. 90, 102 (1980).  Whether litigation of an issue is precluded by collateral estoppel "turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Amcast Indus. Corp.*, 45 F.3d at 158 (quoting *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961)).

In Jones' criminal case, the Adams County Circuit Court considered on her motion to dismiss:  (1) whether the lost recording made by York of the March 21, 2013, conversation was potentially or apparently exculpatory evidence; and (2) if so, whether the Adams County Sheriff's Office acted in bad faith in the handling of that evidence.  After considering arguments and evidence presented by the parties, including the sworn testimony of York and Jones the court denied the motion.  In so doing, the court explained that it found the lost recording was neither apparently nor potentially exculpatory, and regardless, there was no evidence of bad faith.

Here, in arguing that York's failure to disclose the recording was a violation of due process, plaintiff necessarily contends that the recording was material and exculpatory. Understandably, therefore, she seeks to revisit the decision reached by the state circuit court on this same issue, but all the relevant factors suggest that plaintiff should be estopped from relitigating this issue.  The state court's decision that the lost recording was not apparently or potentially exculpatory was final, not tentative.  Jones could have appealed that ruling in her post-conviction motion, but chose not to do so, and nothing in the post-conviction briefing or the order vacating Jones' conviction called into question the court's decision regarding the lost recording.  As to the adequacy of the hearing, the issue

was fully briefed and the subject of an evidentiary hearing, at which both Jones and York testified. Certainly, the effectiveness of Jones' trial counsel's conduct was called into question as to other aspects of the criminal proceedings, but his effectiveness in arguing the exculpatory nature of the lost recording or the prosecutor's bad faith was not raised in Jones' post-conviction briefing, and she does not now identify any flaws in his representation of Jones as to these issues, particularly as to evidence or argument regarding the court's ruling of a lack of bad faith.[8] Accordingly, the court will not relitigate the state court's decision, and thus, plaintiff also cannot support a *Brady* claim on this third basis.

### B. Fabricated Evidence

Plaintiff also argues that there is evidence from which a reasonable jury could find that York falsified or misrepresented evidence provided to the prosecutor. To be sure, courts have "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). However, plaintiff has identified no such evidence.

---

[8] Jones also suggests that York's treatment of the phone records was somehow unconstitutional. (Pl.'s Opp'n (dkt. #48) 12-13.) As the court understands Jones' argument, she primarily contends that York caused a complaint to be issued against her even though he knew from the records that Jones was not in Illinois when Onopa said she was having a conversation with him about the arson. However, as discussed below, there is "no free-standing constitutional tort of malicious prosecution." *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019). Moreover, to the extent that plaintiff is asserting that the phone records could support a claimed *Brady* violation, this, too, must fail because plaintiff does not and cannot argue that the phone records were not disclosed as they were presented and discussed by both sides at trial. *See O'Hara*, 301 F.3d at 569 (belatedly disclosed evidence may only support a *Brady* violation if the disclosure was made "too late for the defendant to make use of the evidence").

In particular, plaintiff contends that "York falsified his police report of his [March 21] conversation with Jones regarding what she reported to York had occurred between Jones and Onopa at the hotel in Marshfield, what she told York she told officer Bornbach, and what conversations York had with Officer Bornbach in verifying Jones' statements to Bornbach." (Pl.'s Opp'n (dkt. #48) 27.) As plaintiff points out, there *are* differences between York's report and the recording of his interview with Jones, as well as other evidence in the record. In particular:

- York did not mention in his report that Jones told him that Onopa had put his hands on her throat, while the recording of the interview shows that Jones told York "he had me by the throat."

- York wrote that Jones called the Marshfield police department to report a theft, while in the recording, Jones told York that she called to report *Onopa's behavior* to the Marshfield Police Department the day after the incident. Only later in the interview, did she say that Onopa took some of her belongings from the motel room.

- York did not memorialize his March 28 call with Bornbach in a police report, although the parties do not dispute that the call occurred.

Unfortunately for plaintiff, these differences are not enough for a reasonable jury to find that York fabricated or falsified his report. The "hallmark of a fabrication case" is that the officer "created the evidence that [he] knew to be false." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). While York certainly could have been more thorough and detailed in his report, there is no evidence that York knew what he wrote or omitted writing was false. The Seventh Circuit has explained in the context of the Fourth Amendment that "the Constitution does not demand perfection." *Pulera v. Sarzant*, 966 F.3d 540, 555-56 (7th Cir. 2020); *see also King v. Grams*, No. 05-C-928, 2006 WL 1598679, at *8 (E.D.

Wis. June 2, 2006) (explaining that "it is not unexpected that one person's memory of specific details might diverge from another's, or that a person's own memory might not be perfect in every detail," but such discrepancies do not necessarily mean that "the witnesses committed perjury or that the prosecutor knowingly made false remarks").  Here, while York's report was not perfect, his statements or omissions do not amount to a material, constitutional violation.

Plaintiff also suggests that York incorrectly summarized his report regarding the recording of Jones purportedly confessing to arson.  According to plaintiff, York did not disclose to the prosecutor that the woman's voice on the recording was "inaudible."  (Pl.'s Opp'n (dkt. #48) 11.)  To the contrary, York *did* include in his report that the voices were difficult to hear clearly, although he believed the female voice to be Jones based on his own interactions with her.  Even if York arguably had reason to suspect that Jones was not present for the recorded conversation Onopa claimed he had with her in Illinois -- having been given phone records indicating she (or again, at least her phone) was in Wisconsin during that time period[9] -- plaintiff runs into a problem of proving causation.  Specifically, both the phone records and the recording were presented for the jury at trial, and from the court's review of the trial transcript, York did not repeat his opinion that the female voice was Jones for the jury.  Thus, plaintiff would be hard-pressed to prove a causal connection between the report and Jones' conviction.  *See Whitlock*, 682 F.3d at 582 (to state a

---

[9] It is not entirely clear that plaintiff even is making this argument in her brief.  (*See* Pl.'s Opp'n (dkt. #48) 12-13.)  Nevertheless, for thoroughness the court will consider it here.

17

constitutional claim under § 1983, officer's act of fabrication must have caused plaintiff's injury).

## C. False Trial Testimony

Plaintiff also accuses York of lying to the jury.  (Pl.'s Opp'n (dkt. #48) 27.)  However, this argument is squarely foreclosed by the rule that trial testimony, including false testimony from a law enforcement officer, is *not* actionable under § 1983.  *See Briscoe v. LaHue,* 460 U.S. 325, 326 (1983) (holding that § 1983 does not authorize a plaintiff to assert a claim for damages against a police officer for giving perjured testimony at his criminal trial); *Curtis v. Bembenek,* 48 F.3d 281, 283 (7th Cir. 1995) ("In *Briscoe,* the Court held that a police officer had absolute immunity from suit under § 1983 for giving perjured testimony at the defendant's criminal trial.") (citing *Briscoe,* 460 U.S. at 326).  Plaintiff points to *Avery v. City of Milwaukee,* 847 F.3d 433 (2017), for the proposition that "an officer who withholds exculpatory evidence and then testifies falsely is not protected by qualified or absolute immunity."  (Pl.'s Opp'n (dkt. #48) 29.)  But what *Avery* actually holds is that an officer who fabricates evidence cannot *immunize* himself from liability by authenticating falsified evidence at trial and then repeating the same false facts in his trial testimony.  847 F.3d at 441.  Thus, *Avery* does *not* repudiate the general rule that witnesses are immune from suit under § 1983 for the testimony they give in a criminal trial.

## D. Probable Cause

Plaintiff also spends much of her brief arguing that York wrongfully caused a complaint to be issued against Jones without probable cause, but fails to explain how these

allegations give rise a constitutional claim.  *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed.").   Because there exists "no free-standing constitutional tort of malicious prosecution," a plaintiff must rely on other constitutional rights to protect against "abusive arrests and fabrication of evidence."  *Lewis*, 914 F.3d at 479 (internal quotations and alterations omitted); *see also Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018).

Here, plaintiff does not allege that she was detained before trial, and so, she cannot raise a Fourth Amendment claim of pretrial detention without probable cause.  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017).  Regardless, her allegations of fabricated or suppressed evidence are discussed under the Due Process framework above, which further demonstrates a lack of proof.  Accordingly, plaintiff has identified no other relevant constitutional claim, and the court can only conclude that she has not stated a federal constitutional claim for the alleged issuance of a complaint against her without probable cause.

### E.  *Monell* Claim

In addition to the claims made through York's conduct, plaintiff purports to state a § 1983 claim against Adams County itself under the framework established by the Supreme Court in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 660 (1978).  To sustain this claim, however, plaintiff must prove that she suffered a constitutional injury, that a policy or widespread custom of falsifying or withholding evidence existed, and that such a policy or custom was the "direct cause" or "moving force" of her constitutional injury.  *See Bd. of Cnty. Comm. of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

Because the court has found no constitutional injury, Jones' *Monell* claim must necessarily be dismissed.  *See Jenkins v. Bartlett*, 487 F.3d 482, 494 (7th Cir. 2007) ("[B]ecause Officer Bartlett did not violate Mr. Jenkins' constitutional rights, there can be no *Monell* liability on the part of the City or Chief Jones."); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010) (summarily dismissing *Monell* claim where no underlying constitutional violation found).  Moreover, plaintiff's offer of proof of an even colorable constitutional claim is wholly devoid of proof of a policy or widespread custom.  Accordingly, plaintiff's *Monell* claim must be dismissed as well.

## II.  State Law Claims

Having dismissed plaintiff's federal claims, there remains the question as to whether the court should exercise supplemental jurisdiction over plaintiff's remaining state law claims.  To begin, there exists a general presumption that federal district courts will relinquish jurisdiction over any supplemental state-law claims where, as here, all federal claims are dismissed before trial.  *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).  Although this presumption is rebuttable, "it should not be lightly abandoned."  *Id.*  (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996)). Here, no compelling reasons weight in favor of retaining jurisdiction over the pendant state law claims.  On the contrary, given the gravity of Jones' allegations against defendants, it is best for Wisconsin courts to decide what, if any, state remedy is available.  Therefore, the court will dismiss these claims without prejudice.

ORDER

IT IS ORDERED that:

1)  Plaintiff's unopposed motion to amend/correct her brief in opposition (dkt. #47) is GRANTED.

2)  Defendants' motion for summary judgment (dkt. #33) is GRANTED.

Entered this 26th day of April, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge